



FILED

Oct 16 2025, 10:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

Shambreka Hall,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

October 16, 2025

Court of Appeals Case No.
25A-CR-868

Appeal from the St. Joseph Superior Court

The Honorable Elizabeth C. Hurley, Judge

Trial Court Cause No.
71D08-2307-F4-68

---

**Opinion by Judge Bradford**
Judge May concurs.
Judge Mathias dissents with opinion.

**Bradford, Judge.**

# Case Summary

[1]  On September 22, 2022, Shambreka Hall was involved in a traffic collision with Dale Womack. Womack died as a result of the injuries that he sustained in the collision. An investigating officer observed signs of impairment in Hall following the collision and her blood subsequently tested positive for THC and THC metabolites. Hall was charged with, and convicted of, Level 4 felony operating a vehicle with a Schedule I or II substance in the blood causing death. Hall contends that the evidence is insufficient to sustain her conviction. She alternatively contends that Indiana Code section 9-30-5-5 is unconstitutionally vague. We affirm.

# Facts and Procedural History

[2]  In September of 2022, Hall was employed delivering food through Door Dash in South Bend. The afternoon of September 22, 2022, Hall received a delivery request from a restaurant near 27th Street and Mishawaka Avenue. As Hall was driving on 31st Street toward Mishawaka Avenue, Hall stopped at the stop sign on 31st Street. Mishawaka Avenue had a speed limit of twenty miles per hour and cross traffic was required to stop. While at the stop sign, Hall's view was partially obstructed.

[3]  At the same time, Womack was leaving Dave's Pub on Mishawaka Avenue. Womack, who was not wearing a helmet, had pulled away from the pub on his motorcycle and traveled approximately 270 feet, quickly accelerating to

approximately thirty-seven to forty miles per hour. Womack's motorcycle had "after-market exhaust," *i.e.*, no mufflers, which would have caused the motorcycle to be "very loud[,]" louder than a standard motorcycle. Tr. Vol. II p. 116.

[4] In subsequently describing the events that led to the collision with Womack, Hall testified as follows:

> I came to a complete stop. So the light on 30[th] Street had turned red. When it turned red two cars came by. When I seen [*sic*] that light turn red and the two cars had came [*sic*] by, I creeped out. And when I creeped out[,] I looked like four times. I had my window down, and I looked and I didn't see anything so I went out and made a left turn. While I was making that left turn I didn't see him until I was out [in the intersection] then he hit me.

Tr. Vol. II p. 176. Womack collided with the rear driver's side door of Hall's vehicle and Womack was "launched" from his motorcycle and landed on the pavement. Tr. Vol. II p. 111. Womack was pronounced dead at the scene.[1]

[5] After the fatal-crash team was activated, Hall was transported to South Bend Memorial Hospital as part of the investigation. Mishawaka Police Officer Corey Cronk was a member of St. Joseph County "FACT team"[2] and had

---

[1] Womack's cause of death was subsequently determined to be "[m]ultiple blunt force injuries with the primary one that led to his death was the skull fracture." Tr. Vol. II p. 15. At the time of his death, Womack had a blood alcohol concentration ("BAC") of 0.152 "grams of alcohol per hundred milliliters of blood[.]" Tr. Vol. II p. 122.

[2] The acronym "FACT" stands for the fatal alcohol crash team. Tr. Vol. II p. 68.

specialized training as a drug-recognition expert. Tr. Vol. II p. 36. Officer Cronk responded to Memorial Hospital, where he encountered Hall. St. Joseph County Police Sergeant Josh Siekman, who was also a member of "the FACT team[,]" read Hall her *Miranda*[3] rights and implied-consent notifications. Tr. Vol. II p. 43. Hall agreed to speak with the officers, engage in a drug-recognition evaluation, and submit to a blood draw. A Memorial Hospital phlebotomist performed the blood draw, with Officer Cronk observing.

[6] Officer Cronk conducted a drug-recognition evaluation. Initially, Hall was "was very cooperative. She was alert, conscious, oriented, and obviously talking to" the investigating officers. Tr. Vol. II p. 43. Hall had no horizontal gaze nystagmus in her left eye, likely due to some blindness in that eye. Officer Cronk also administered a modified Romberg test, during which Hall exhibited body tremors and eye-lid tremors. Hall had "a two[-]inch sway front to back. She also estimated the passage of 30 seconds [at] 42 seconds," which gave Officer Cronk "indication that her internal clock at that point in time is slowed down." Tr. Vol. II pp. 44–45.

[7] Hall "was not able to stay in the starting position" for the walk-and-turn test. Tr. Vol. II p. 45. Hall missed three heel-to-toes on her first set of nine steps. On her second set, Hall's "steps were very slow and very methodical. Much slower than [Officer Cronk] would observe a normal person conduct these nine

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

steps. The depth perception seemed off, and they were very slow, taking a pause between each step." Tr. Vol. II p. 46. During the one-leg stand test, Hall became emotional. After Officer Cronk gave her the opportunity to regain her composure, Hall

> put her foot down twice. She counted 19 seconds when it was actually 30. So, again, her clock at that point was slow. On her second set when she balanced on her left foot, no clues were observed at that time, and she counted 23 seconds in a 30 second time.

Tr. Vol. II p. 46.

[8] Hall's body temperature and pulse rates were normal, but her blood pressure was high. Officers tested Hall's pupil responses in three different light settings: direct light, room light, and near darkness. Hall's pupils were dilated and outside the normal range in room-light and direct-light settings but were normal in the near-and-total-darkness setting. Throughout the course of the examination, Hall's

> mannerisms and her reflexes and her face and eye lids all went down hill. She became very slow. She became very relaxed. She became more droopy in her face, more droopy in her eye lids. She was starting to go down hill more at that point in time as you can tell by the clinical indicators and her nine step walk and turn. She kind of went from an up to a down in a relatively short period of time.

Tr. Vol. II p. 48.

[9] Hall's blood tested positive for THC, specifically testing positive for both delta 9 THC and delta 9 carboxy. Robert Ruhl, a forensic scientist with the Indiana State Department of Toxicology, explained that

> Delta 9 THC, that is the psychoactive compound that's marijuana essentially. If any impairment is present, it's caused by delta 9 THC. And then as your body breaks down THC, it breaks it down into delta 9 carboxy, which is an inactive metabolite. So the presence of carboxy in a sample just means that at some point THC was consumed by the person.

Tr. Vol. II p. 144. Hall admitted that "she used to smoke marijuana … but she's since transitioned from smoking to eating edible gummies[.]" Tr. Vol. II p. 52. She claimed, however, that the last time she had done so was about a week before the collision. Hall initially made no complaint of head pain but, toward the end of the hour-long examination, complained of neck pain. Hall had not presented any indications of a concussion and was not, at any relevant point, diagnosed with a concussion. Based upon the totality of his evaluation, Officer Cronk believed that Hall was impaired at the time of the collision. Tr. Vol. II p. 53.

[10] On July 25, 2023, the State charged Hall with Level 4 felony operating a vehicle with a Schedule I or II substance in the blood causing death, Level 4 felony operating a vehicle while intoxicated ("OWI") causing death, and Level 5 felony reckless homicide. The case proceeded to trial and, following the conclusion of the evidence, the trial court granted Hall's motion for a directed verdict on the reckless-homicide charge. The jury found Hall guilty of Level 4

felony operating a vehicle with a Schedule I or II substance in the blood causing death but not guilty of Level 4 felony OWI causing death. The trial court subsequently sentenced Hall to a two-year term, which was to be served "as a direct commitment to" community corrections. Tr. Vol. III p. 6.

## Discussion and Decision

[11]     Hall contends that the evidence is insufficient to sustain her conviction for Level 4 felony operating a vehicle with a Schedule I or II substance in the blood causing death.

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146–47 (Ind. 2007) (internal brackets, citations, emphasis, and quotations omitted). Stated differently, in reviewing the sufficiency of the evidence, "we consider only the evidence and reasonable inferences most favorable to the convictions, neither reweighing evidence nor reassessing witness credibility" and "affirm the judgment unless no reasonable

factfinder could find the defendant guilty." *Griffith v. State*, 59 N.E.3d 947, 958 (Ind. 2016).

[12]     In order to prove that Hall had committed Level 4 felony operating a vehicle with a Schedule I or II substance in the blood causing death, the State was required to prove that Hall had caused Womack's death "when operating a vehicle … with a controlled substance listed in schedule I or II of IC 35-48-2 or its metabolite in [her] blood." Ind. Code § 9-30-5-5(a)(2). It is undisputed that Hall and Womack were involved in a traffic collision which resulted in Womack's death. It is also undisputed that Hall had THC in her bloodstream at the time of the collision and that THC qualifies as a schedule I drug. *See* Ind. Code § 35-48-2-4(d) (listing marijuana and tetrahydrocannabinols, commonly referred to as THC, as schedule I drugs).

[13]     In challenging the sufficiency of the evidence to sustain her conviction, Hall argues that the evidence was insufficient to prove that she had caused Womack's death, arguing that an intervening cause, *i.e.*, Womack's intoxication and allegedly reckless driving, broke the chain of her criminal responsibility.

> An intervening cause is an independent force that breaks the causal connection between a defendant's actions and the victim's injuries. In order for an intervening cause to break the chain of criminal responsibility, it must be so extraordinary that it would be unfair to hold the defendant responsible for the actual result.
>
> This court has explained causation in the context of criminal liability:

The concept of causation in criminal law is similar to that found in tort law. Like in tort law, the criminal act must be both 1) the actual cause (sometimes called the "cause-in-fact"); and 2) the legal cause (sometimes called the "proximate cause") of the result. Cause-in-fact requires that "but for" the antecedent conduct, the result would not have occurred. If there is more than one cause which precipitates the result, the defendant's action is the cause-in-fact if it is a "substantial factor" in bringing about that result.

Legal or proximate cause is a distinct concept, speaking not to the physical relationship between the actor's conduct and the result, but instead embodying a value judgment as to the extent of the physical consequences of an action for which the actor should be held responsible. Thus, proximate cause questions are often couched in terms of "foreseeability"; an actor is not held responsible for consequences which are unforeseeable. In Indiana, a result is deemed foreseeable if it is a "natural and probable consequence" of the act of the defendant.

In cases where an action of the victim ... affects the chain of causation, foreseeability is again a factor. Such an occurrence is called an "intervening cause", and it becomes a superseding cause breaking the chain of causation if it was not foreseeable. If an intervening and superseding cause aided in bringing about the result, the defendant is not criminally liable.

*Cannon v. State*, 142 N.E.3d 1039, 1043 (Ind. Ct. App. 2020) (internal brackets, citations, and quotations omitted).

[14]    Based on the facts of this case, we cannot say that Womack's decision to operate his motorcycle while intoxicated or the alleged reckless manner of operating his motorcycle (that being operating the motorcycle above the posted

speed limit without wearing a helmet) was so extraordinary that it would be unfair to hold the Hall responsible for the actual result, *i.e.*, Womack's death. *Id.* There is no dispute that Hall was required to stop and yield to traffic at the intersection where the collision occurred. There is also no dispute that, given his direction of travel, Womack was not. The evidence indicates that Hall failed to yield to oncoming traffic and pulled out into the line of traffic in front of Womack, leading to his impact with the back half of her vehicle.

[15] We have previously noted that because motorists regularly exceed posted speed limits and fail to wear safety equipment, such facts are not so extraordinary to constitute an intervening cause that would affect criminal liability. *See generally id.* at 1044–45 (providing that the victim's failure to wear a seatbelt was foreseeable and was not an intervening cause that would eliminate criminal liability). Moreover, the exhaust system on Womack's motorcycle had been modified, making it louder than a normal motorcycle. Given the close proximity of all of the relevant locations and Hall's testimony that her window had been open at the time of the collision, one could reasonably infer that Hall should have heard Womack's motorcycle prior to the collision, even if her sight had been impaired by other parked vehicles. Hall's argument regarding causation was raised before and ultimately rejected by the jury. Her appellate argument as to causation effectively amounts to a re-hash of her argument below and invites us to reweigh the evidence, which we will not do. *See Griffith*, 59 N.E.3d at 958.

[16]     Hall alternatively contends that Indiana Code section 9-30-5-5 is unconstitutional.  Hall concedes that she did not challenge the constitutionality of the statute below.  Failure to raise an issue before the trial court generally results in waiver of appellate review.  *See Layman v. State*, 42 N.E.3d 972, 975–76 (Ind. 2015) (providing that constitutional issues may be waived if not raised before the trial court).  However, "[e]ven though the general rule is that failure to challenge the constitutionality of a statute at trial results in waiver of review on appeal, [appellate courts have] long exercised [their] discretion to address the merits of a party's constitutional claim notwithstanding waiver."  *Plank v. Cmty. Hosps. of Ind., Inc.*, 981 N.E.2d 49, 53 (Ind. 2013) (internal citations omitted).  "It is certainly the case that 'appellate courts are not prohibited from considering the constitutionality of a statute even though the issue otherwise has been waived.'"  *Layman*, 42 N.E.3d at 976 (quoting *Plank*, 981 N.E.2d at 53–54).  Indeed "a reviewing court may exercise its discretion to review a constitutional claim on its own accord."  *Plank*, 981 N.E.2d at 54.  We exercise our discretion to address Hall's constitutional claim.

[17]          When considering the constitutionality of a statute, we begin with the presumption of constitutional validity, and therefore the party challenging the statute labors under a heavy burden to show that the statute is unconstitutional.  All reasonable doubts must be resolved in favor of the statute's constitutionality.  Under basic principles of due process, a statute is void for vagueness if its prohibitions are not clearly defined.  A statute is not unconstitutionally vague if persons of ordinary intelligence would interpret it to adequately inform them of the proscribed conduct.  No statute need avoid all vagueness, and because statutes are condemned to the use of words, there will always be

uncertainties for we cannot expect mathematical certainty from our language.

*Bennett v. State*, 801 N.E.2d 170, 173–74 (Ind. Ct. App. 2003) (internal brackets, citations, and quotations omitted).

[18] Hall claims that because Indiana Code section 9-30-5-5 contains a blanket prohibition against driving with a schedule I or II drug in a person's blood and does not require an additional showing of impairment, the statute is unconstitutional as it "is not rationally designed to [prevent dangerous behavior] when it punishes behavior that is not dangerous at all." Appellant's Br. p. 12. However, as Hall concedes, we have previously rejected similar constitutional challenges to Indiana Code section 9-30-5-5. *See id.* at 173–77; *see also Shepler v. State*, 758 N.E.2d 966, 969–72 (Ind. Ct. App. 2001) (rejecting a constitutional challenge to Indiana Code section 9-30-5-1, which provides that it is a Class C misdemeanor to operate a vehicle with a schedule I or II controlled substance, or its metabolite, in one's blood), *trans. denied*. In *Bennett*, we concluded that

> a flat ban on driving with any proscribed controlled substance in the body, whether or not capable of causing impairment, is permissible. It is permissible because, unlike alcohol, there is no acceptable level of drug use that can be quantified so as to distinguish between users who can drive unimpaired and those who are presumptively impaired. Consequently, our legislature could have reasonably concluded that no level of schedule I or schedule II controlled substances can be acceptably combined with driving a vehicle. Thus, it is rational for the legislature to

> impose the flat ban with regard to controlled substances while not imposing the same ban with regard to alcohol.

*Bennett*, 801 N.E.2d at 176 (internal brackets and quotation omitted); *see Shepler*, 758 N.E.2d at 969–70 (reaching the same conclusion).  We apply our conclusions in *Bennett* and *Shepler* to the instant constitutional challenge and reach the same conclusion.  Hall's constitutional challenge is without merit.[4]

[19] The judgment of the trial court is affirmed.

May, J., concurs.

Mathias, J., dissents with opinion.

ATTORNEY FOR APPELLANT

John A. Kindley
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Megan M. Smith

---

[4] We note that Hall does not cite to any relevant Indiana authority that supports her contention that Indiana Code section 9-30-5-5 is unconstitutional.  She instead relies on a dissent in a case that was decided by the Iowa Supreme Court, *see State v. Childs*, 898 N.W.2d 177, 196–201 (Iowa 2017) (Appel, dissenting), and a case decided by the Georgia Supreme Court, *see Love v. State*, 517 S.E.2d 53 (Ga. 1999).  To the extent that these cases may support Hall's position, we note that while foreign authority may be considered persuasive, it is not binding on Indiana courts.  *See generally Midwest Equip. & Supply Co. v. Garwood*, 87 N.E.3d 33, 36–37 (Ind. Ct. App. 2017) (considering the parties' arguments relating to Illinois and Iowa caselaw but finding the non-binding authority to be unpersuasive).

Deputy Attorney General
Indianapolis, Indiana

**Mathias, Judge, dissenting**.

I respectfully dissent from the majority's conclusion that the State presented sufficient evidence to show that Hall caused Womack's death.[5]

The majority's opinion disregards substantial uncontradicted evidence and, in doing so, deviates from our well-established standard of review in such appeals. *See McIlquham v. State*, 10 N.E.3d 506, 511 (Ind. 2014) (noting that we will consider "substantial uncontradicted evidence" contrary to the judgment in assessing "whether the evidence is sufficient to support" that judgment) (quoting *Holder v. State*, 847 N.E.2d 930, 935 (Ind. 2006)). The majority's analysis fills those key evidentiary gaps with constitutionally insufficient guesswork. *See Vasquez v. State*, 741 N.E.2d 1214, 1216 (Ind. 2001) (recognizing that a conviction "cannot be based upon evidence which is uncertain or speculative or which raises merely a conjecture or possibility") (quoting *Shutt v. State*, 233 Ind. 169, 174, 117 N.E.2d 892, 894 (1954)).

Applying our standard of review appropriately here demonstrates that Hall's conviction is directly contrary to precedent of our Supreme Court explaining causation under Indiana Code section 9-30-5-5. *See Abney v. State*, 766 N.E.2d 1175, 1177-78 (Ind. 2002).

---

[5] I express no opinion on Hall's alternative argument that Indiana Code section 9-30-5-5 is unconstitutional.

### 1. The facts as understood through our standard of review.

In South Bend, northbound traffic on 31st Street must yield to traffic on Mishawaka Avenue where those two roads intersect. Mishawaka Avenue is a single lane of travel in both the east and west directions and, at least at its intersection with 31st Street, is a straight path of travel and perpendicular to 31st Street.

Northbound traffic on 31st Street is met with a stop sign at Mishawaka Avenue, while traffic on Mishawaka Avenue does not stop. As northbound motorists on 31st Street seek to enter that intersection, they must first stop at the stop sign, which brings them "pretty much even" with a building to the west side of the intersection. Tr. Vol. 2, p. 31. Thus, "[i]n order to be able to clearly see" around that building, motorists must "edge forward a little bit[] and take a second look to make sure [eastbound] traffic is clear." *Id.* This brings northbound motorists into a crosswalk and, if need be, a parking lane on Mishawaka Avenue and then a bike lane before they may be able to determine the safety of proceeding. One nearby business owner identified the intersection as "very dangerous." *Id.* at 162. The speed limit for traffic on Mishawaka Avenue near and through the intersection is twenty miles per hour.

Just after 5:00 p.m. on September 22, 2022, Hall operated a passenger vehicle northbound on 31st Street and came to a stop at the stop sign at the intersection with Mishawaka Avenue. In addition to the obstructed view created by the building to the west of that intersection, at the time Hall came to a stop, there also was a "big white truck" parked in the parking lane on Mishawaka Avenue

in front of the building. *Id.* at 32. Accordingly, after two cars she saw went past her, Hall "creeped out" and looked several more times for oncoming traffic, but she "didn't see anything so [she] went" into the intersection to make a left turn onto westbound Mishawaka Avenue. *Id.* at 176.

[26] Around that same time, Womack left Dave's Pub, which is on the north side of Mishawaka Avenue and about 270 feet west of 31st Street. Womack was on a motorcycle, his blood alcohol content at the time was 0.152 (approximately twice the legal limit),[6] and he was not wearing a helmet. He pulled out into eastbound traffic on Mishawaka Avenue, causing westbound traffic to swerve to avoid a collision, and he engaged his motorcycle in "heavy acceleration" to between thirty-seven and forty miles per hour. *Id.* at 120. An investigating officer would later testify that the fastest speed Womack could have possibly reached on his motorcycle in the short stretch between Dave's Pub and the intersection with 31st Street was between forty and forty-two miles per hour.

[27] As Hall progressed into the intersection, Womack suddenly came upon her. Thinking he did not see her, Hall tried to accelerate through the intersection, but she was unable to avoid Womack. He struck the driver's rear side of her vehicle and was thrown approximately thirty-seven feet. The driver's side airbag in Hall's vehicle deployed. Although "designed to protect" a driver's "head and neck area," these airbags are known to be able to cause "something like

---

[6] *See* Ind. Code § 9-30-5-1(a) (2022).

horizontal whiplash" and "concussion[s] or concussion-like symptoms." *Id.* at 57-58. Womack died at the scene.

[28] Mishawaka Police Department Officer Corey Cronk was one of several responding officers to the crash. Hall admitted to him that she regularly used marijuana but asserted it had been about one week since she last did so. About thirty minutes after the accident but without Hall having been examined by medical professionals for a possible concussion, Officer Cronk administered several field sobriety tests to Hall. At the beginning of those tests, Hall "was alert, conscious, [and] oriented." *Id.* at 43. Her "face was normal. Her eye lids were normal." *Id.* However, while Cronk administered his tests over the course of about thirty minutes, Hall's focus and coordination appeared to diminish. About one hour after the accident, "her mannerisms and her reflexes and her face and eye lids all" went downhill. *Id.* at 48. Hall's reactions "became very slow. She became very relaxed. She became more droopy in her face" and "her eye lids." *Id.* Officer Cronk concluded that those symptoms demonstrated that Hall was "impaired" by "cannabis" at the time of the accident, although he later conceded that her symptoms could have been equally telling of a possible concussion. *Id.* at 53, 64. An ensuing blood test identified a metabolite of marijuana in Hall's blood at the time of the accident. Hall was never evaluated for a possible concussion. *See id.* at 186-87.

[29] The State charged Hall with Level 4 felony causing death when operating a vehicle with a schedule I or II controlled substance in the blood; Level 4 felony causing death when operating a motor vehicle while intoxicated; and Level 5

felony reckless homicide. At her ensuing jury trial, the State's evidence made clear that Hall had not committed any traffic infractions at the time Womack collided with her. The State also presented no evidence that Hall had negligently or unreasonably entered the intersection when she did. And, while the State presented evidence that Womack's motorcycle was abnormally loud, there is no evidence that Hall heard the motorcycle before the accident or, even if she had, that she would have been able to locate the source of the sound of it. Further, the State's evidence made clear that Hall was lucid at the scene immediately after the crash and only about one hour later did she appear disoriented, which the State's witnesses conceded was consistent with concussion symptoms.

[30] Following the State's close of its case-in-chief, the trial court granted Hall's motion for a directed verdict on the Level 5 felony reckless homicide charge. Hall then testified in her defense and presented uncontradicted testimony that she had come to a complete stop at the stop sign on 31st Street, slowly crept forward and looked multiple times before proceeding into the intersection, and did not see Womack until he suddenly came upon her in the intersection, at which point there was nothing she could do to avoid a collision.

[31] The jury found Hall guilty of Level 4 felony causing death when operating a vehicle with a schedule I or II controlled substance in the blood and not guilty of Level 4 felony causing death when operating a motor vehicle while intoxicated. After a sentencing hearing, the trial court entered its judgment of

conviction against Hall and sentenced her to two years suspended to home detention.

## 2. The evidence is not sufficient to show that Hall caused Womack's death.

[32] I consider only whether the State presented sufficient evidence to support Hall's conviction for Level 4 felony causing death when operating a vehicle with a schedule I or II controlled substance in the blood. For challenges to the sufficiency of the evidence, we consider only the probative evidence and the reasonable inferences therefrom that support the judgment of the trier of fact. *Hall v. State*, 177 N.E.3d 1183, 1191 (Ind. 2021). We will neither reweigh the evidence nor judge witness credibility. *Id.* We will affirm a conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id.*

[33] However, "our standard of review does not demand that we selectively read the record and ignore 'substantial uncontradicted evidence . . . contrary [to the judgment] to decide whether the evidence is sufficient . . . .'" *Fedij v. State*, 186 N.E.3d 696, 708 (Ind. Ct. App. 2022) (quoting *McIlquham*, 10 N.E.3d at 511). Further, the State cannot premise a conviction "upon evidence which is uncertain or speculative or which raises merely a conjecture or possibility." *Vasquez v. State*, 741 N.E.2d 1214, 1216 (Ind. 2001) (quoting *Shutt v. State*, 233 Ind. 169, 174, 117 N.E.2d 892, 894 (1954)). The requirement that we consider substantial uncontradicted evidence and the prohibition against relying on speculation are significant components of our standard of review; they ensure

that our review of sufficiency questions remains constrained without making the right to appellate review illusory. *See, e.g., Galloway v. State*, 938 N.E.2d 699, 709-10 (Ind. 2010) (noting that a standard of review "under which appellate courts merely 'rubber stamp' the fact finder's determinations, no matter how unreasonable, would raise serious constitutional concerns because it would make the right to an appeal illusory").

[34] Indiana Code section 9-30-5-5(a) (2022) provides that "[a] person who causes the death . . . of another person when operating a vehicle . . . with a controlled substance listed in schedule I or II . . . or its metabolite in the person's blood" commits a Level 4 felony. As we have explained:

> The concept of causation in criminal law is similar to that found in tort law. Like in tort law, the criminal act must be both 1) the actual cause (sometimes called the "cause-in-fact"); and 2) the legal cause (sometimes called the "proximate cause") of the result. Cause-in-fact requires that "but for" the antecedent conduct, the result would not have occurred. If there is more than one cause which precipitates the result, the defendant's action is the cause-in-fact if it is a "substantial factor" in bringing about that result.
>
> Legal or proximate cause is a distinct concept, speaking not to the physical relationship between the actor's conduct and the result[] but instead embodying a value judgment as to the extent of the physical consequences of an action for which the actor should be held responsible. Thus, proximate cause questions are often couched in terms of "foreseeability"; an actor is not held responsible for consequences which are unforeseeable. In Indiana, a result is deemed foreseeable if it is a "natural and probable consequence" of the act of the defendant.

*Bowman v. State*, 564 N.E.2d 309, 313 (Ind. Ct. App. 1990) (citation modified), *summarily aff'd in relevant part*, 577 N.E.2d 569, 571 (Ind. 1991).

[35] And in the context of Indiana Code section 9-30-5-5 specifically, the Indiana Supreme Court has long held:

> to sustain a conviction under section 9-30-5-5[, . . . the State must] focus on the driver's acts[.] If the driver's conduct caused the injury, he commits the crime; if someone else's conduct caused the injury, he is not guilty. This is simply a short-handed way of stating the well-settled rule that the State must prove the defendant's conduct was a proximate cause of the victim's death.

*Abney*, 766 N.E.2d at 1177-78 (citation modified). Although section 9-30-5-5 has been amended several times since 2002, nothing in the language of the statute at issue here suggests any deviation by our General Assembly in our Supreme Court's articulation of causation under that statute.

[36] I would hold that the State failed to prove that Hall caused Womack's death under section 9-30-5-5.[7] The State presented no evidence that Hall's conduct was the proximate cause of Womack's death. Indeed, the evidence is unambiguous that Womack's conduct of operating a motorcycle without a helmet at twice the posted speed limit and nearly twice the legal blood alcohol content level, after pulling suddenly into traffic from a business 270 feet from a

---

[7] Hall challenges both actual causation and proximate causation. I limit my analysis to proximate causation.

dangerous intersection that he then quickly accelerated into, was the proximate cause of his death. *See id.*

[37] The majority erroneously contends that "[t]he evidence indicates that Hall failed to yield to oncoming traffic and pulled into the line of traffic in front of Womack . . . ." *Supra* p. 10. To the contrary, there is no evidence that Hall committed any traffic infractions, that she in any way operated her vehicle unreasonably, or that she even could have seen Womack prior to the collision given the reckless manner in which he operated his motorcycle. And, again, there is no evidence that Hall could have located Womack's motorcycle by its sound, notwithstanding the majority's assumptions to the contrary. Indeed, as to her driving behavior, the trial court granted Hall's motion for a directed verdict on the State's charge of reckless homicide. Hall was merely the unlucky motorist who happened to be traveling through the intersection at the moment Womack recklessly speeded into it, and that is not a basis for criminal causation.

[38] The majority also concludes that Officer Cronk "observed signs of impairment in Hall following the collision," which the majority then uses to support Hall's conviction. *Supra* at 2. But the jury found Hall not guilty of driving while intoxicated, and rightfully so. On that allegation, the State's evidence was unable to demonstrate beyond a reasonable doubt that Hall was "impaired" by "cannabis" during or *within the hour following* the collision. Tr. Vol. 2, p. 53. Rather, the State's witnesses made clear that, when Hall first manifested disorientation and related symptoms about an hour after the collision, she may

have been suffering the symptoms of a possible concussion given the deployment of her vehicle's driver's side airbag. The majority appears to brush that uncontroverted evidence aside on the theory that Hall was "not . . . diagnosed with a concussion." *Supra* at 6. But of course, she was not diagnosed; *she was never examined by a medical professional for a concussion*.

[39] Taking the record as a whole and both including uncontradicted evidence and also excluding mere guesswork, the State's argument in support of Hall's conviction amounts to taking the position that it is sufficient to impose serious criminal liability under section 9-30-5-5 on a motorist who played any "contributing" part in producing another's injury or death so long as, at some point in her metabolically relevant past, that motorist had ingested a prohibited controlled substance. *See Abney*, 766 N.E.2d at 1178. The State's position is directly contrary to our Supreme Court's holding and reasoning in *Abney* as well as well-established principles of criminal causation. I reject the State's position accordingly. *See id.*; *Bowman*, 564 N.E.2d at 313. I further note that the State identifies no authority in its brief in which an Indiana appellate court has affirmed a conviction under section 9-30-5-5 merely because the defendant was a "contributing cause," rather than the proximate cause, of another's injury or death. *Cf. Gutenstein v. State*, 59 N.E.3d 984, 996 (Ind. Ct. App. 2016) (noting the State's charges under section 9-30-5-5 were premised on the manner in which the defendant had operated his vehicle), *trans. denied*.

[40] Prosecutors are human. Prosecutors make mistakes in their charging decisions from time to time.[8] Juries are human. Juries make mistakes in their deliberations and verdicts from time to time. That is why our system of justice provides for appellate review.

[41] The facts of this case would not survive a legal analysis under the much lower burden for comparative fault between the reckless decedent and Hall to impose liability on Hall in a civil trial. These facts do not survive analysis under the much more rigorous criminal standard of guilt beyond a reasonable doubt.

[42] For all of these reasons, I would reverse Hall's conviction for Level 4 felony causing death when operating a vehicle with a schedule I or II controlled substance in the blood.

---

[8] No grand jury was convened by the prosecutor to consider whether to charge Hall with any crime at all.